CUTTING *v.* FLORIDA RY. & NAV. CO. MEYER *v.* SAME. BROWN *v.* SAME. CENTRAL TRUST CO. *v.* SAME. GUARANTEE T. & S. D. CO. *v.* SAME. DAVIS *v.* SAME, (MALLORY *et al.*, Intervenors.)

*(Circuit Court, N. D. Florida.* August, 1890.)

EQUITY PRACTICE—MASTER'S REPORT.
> Where the exceptions to a master's report make no allusion to the evidence, and are not supported by the master's statement, and such statement is sufficient to sustain his conclusions, the report should be confirmed.

In Equity. On exceptions to master's report.
*H. Bisbee,* for intervenors.
*John A. Henderson,* for respondent.

SPEER, J. The petition in this case was filed on the 1st day of July, 1887, and the answer thereto on November 25, 1887. It was referred to the master to take testimony, and report what amount, if any, was due the petitioners.

The petition avers that the New York & Texas Steam-Ship Company is a corporation, whose vessels have been for years plying between the ports of New York and Fernandina and Jacksonville, with railroad connections with the defendant company, and with the predecessors of said company; that the defendant's line of railroad extended from the Florida ports above mentioned to the Chattahoochee river, and that the Central Railroad Company of Georgia, and the Savannah, Florida & Western Railroad Company, each had a line of railway extending from Savannah, in Georgia, with connections at Savannah with the Ocean Steam-Ship Company for New York. The petition further avers that prior to the summer of 1886 the defendant company and the Georgia companies were competitors for the inward and outward bound freight of the Chattahoochee valley. In this competition, the Ocean Steam-Ship Company was involved as a through connection to Georgia railroads, and the petitioner likewise was involved as a connection for the defendant company. That a sharp cutting of rates had been indulged in as the result of such competition. That for 10 years prior to the summer of 1886 the petitioner had through business connection with the defendant company and its predecessors, and that upon through freight to and from New York to the Chattahoochee valley it had received 60 per cent. of the total freight charges for carrying such through freight. That in the summer of 1886, to avoid another war of rates, the Georgia company's and the defendant company's railroad entered into a pooling contract, by which the freight to and from the Chattahoochee valley to Fernandina and Savannah was to be divided; and Virgil Powers, of Georgia, was appointed commissioner to receive and divide out freight moneys according to the percentages named in the contract. The petitioner insists that it is entitled to its share of 60 per cent. net profits derived under said pooling contract by the receiver of the defendant company, and avers

that it had assurances from the receiver of the Florida Railway & Navigation Company and his traffic manager that it was to be included therein. That the receiver relied and depended exclusively upon the petitioner to maintain freight rates fixed by him in competition with the said Georgia companies and their steam-ship connections, or, on the other hand, to maintain the said pooling contract. The petitioner has maintained the freight rates agreed upon by the said pooling contract in good faith, believing that it was a party thereto. Respondent admits the existence of the pooling contract, but denies that it included the petitioner's line of steamers; that it was limited in terms to South Atlantic ports; and that not only petitioner's steamers, but all ships carrying between South Atlantic ports and the ports of Boston, New York, and all eastern points were excluded from participation in the distribution of the revenue arising therefrom. The respondent admits having received under said contract the gross amount of $14,210.97, of which $11,085.03 was received by the carriage of cotton from the Chattahoochee valley to the port of Savannah for local delivery or foreign export. For these purposes the petitioner had no facilities whatever, but respondent denies that there has ever been any contract between the petitioner and the defendant company as to a division of percentages of freight moneys earned, but that this was a matter of special agreement, and not a general contract for 60 per cent. to be given to the petitioner.

The master took a great volume of testimony, which is in part set out in his report. It appears from the testimony that the steam-ships of the petitioner and the defendant company and its predecessors had each honored the tickets and bills of lading of the other. The petitioner's line (which, for convenience, we will call the "Mallory Line") was the main connection coastwise for New York to respondent's railroad, although other lines existed, viz., the Charleston & Florida Steam-Ship Line, the New York & Charleston Line, and the Ocean Steam-Ship Company, via Live Oak, Callahan, and Savannah. The averments as to the competition for the business of the Chattahoochee valley, and especially for the cotton shipped therefrom, was shown by the evidence. The effort to avoid a war of rates, in pursuance of which the traffic managers of the three railroads above mentioned met at different times through the spring and summer of 1886, was also shown. Their conferences resulted in a so-called "pooling contract," executed at Washington, D. C., on July 16, 1886, which contract was signed by the traffic managers of the railroads above named. The rates were fixed by agreement entered into at Savannah on July 21, 1886, when Virgil Powers, of Georgia, was agreed upon as the party to whom statements should be made, and who should act as clearing-house agent. The practical effect of this arrangement was that no cotton was carried out of the Chattahoochee valley by the Florida Railway & Navigation Company during the season of 1886 and 1887. The net amount which accrued to that company arising out of the pooling contract was $14,210.97. Petitioner claims that, without its line as a through connection, the Florida Railway & Navigation Company would not have been recognized in the pooling contract

by the other parties, and that, pending the negotiations for that contract, the petitioner had assurances by letters and telegrams from F. B. Papy, then traffic manager of the Florida Railway & Navigation Company, that the Mallory Line should be beneficiaries in the contract to be made. These letters, or the substance of them, are set out in the master's report. The correspondence is lengthy, but it may be summed up in the following letter from F. B. Papy, traffic manager, to R. W. Southwick, Esq., the representative of the petitioner:

"When this question was open for discussion and agreement the proposition was to include all the lines running through to New York, Boston, and Philadelphia; and upon that theory I presented figures to C. H. Mallory & Co., which would yield the lines an interest between sixty and seventy-five thousand dollars per annum. The discussion of this matter took several months. However, the Georgia Central and the S. F. & W. R. R. finally determined that the pool should not extend beyond South Atlantic ports, and a division of the business must be upon the basis of rates to these South Atlantic ports, and not beyond. They also insisted that the business from Savannah proper to Chattahoochee Landing should not be included. I understood that it should. The matter was then taken out of the hands of the agents, and was settled by Mr. Haynes and Mr. Duval, which made the pool apply only to South Atlantic ports, and to exclude Savannah from it as well as the several steam-ship lines. The agreement on that basis went into effect, I think, in August, 1886, after the agreement was concluded; and, as evidence that the several steam-ship lines were not included, I wrote C. H. Mallory & Co., suggesting there was nothing in the contract which forbade them from taking freight."

The witness F. B. Papy, whose letter has been quoted, was at the time of making the pooling contract the traffic manager for the Florida Railway & Navigation Company, who is the respondent here. It is undoubtedly true from all of the correspondence that it was originally his purpose to have included the steam-ship line represented by the petitioner; but it is equally true that this line was not taken into the pooling contract, and that no contract between the Mallory Line and the Florida Railway & Navigation Company as to percentages on freight had been made. The testimony of Mr. Duval, the receiver, is exceedingly important in this connection. He states that, had it been the intention to include the Mallory Line in the pooling contract, a much larger percentage would have been claimed by the Florida Railway & Navigation Company; that the Mallory Line was interested in keeping up the rates, especially as it was interested in another pool, and was compelled to abide by the rates established by the Southern Railway & Steam-Ship Association; that, had there been a war of rates and a cutting made in the through business, the entire cutting on the rate would have come out of the Florida Railway & Navigation Company connection, the Mallory Line claiming their full portion of the rates as established by said association. He further testifies that 80 per cent. of the Chattahoochee valley cotton would have gone over the line of the railroad companies to Savannah, as in former years, via Live Oak, Callahan, and Fernandina, as most of his business is Savannah business properly; that there was no consideration that entitled the Mallory Line to compensation out of the pooling contract; that he, as receiver, did not rely upon

the Mallory Company, but put off Chattahoochee business to the Savannah, Florida & Western Railroad Company and the Georgia Central.

The master concludes from all of the evidence that it was the original intention of the traffic manager of the Florida Railway & Navigation Company to include the Mallory Line in the pool which was to be formed. In this we agree with him. We are convinced that this intention was changed, as we have already indicated, in consequence of the position of the Georgia Central Railroad and the Savannah, Florida & Western Railroad Company as to extending the pool beyond the South Atlantic ports. The small amount realized by the Florida Railway & Navigation Company as its share of the pool, viz., $4,291, confirms the theory that the pooling contract did not extend beyond the South Atlantic ports. It clearly did not, but F. B. Papy, traffic manager for the receiver, notified C. H. Mallory & Co., on August 11, 1886, that the pooling contract was so officially considered by him. This contract appears to have been entered into by the parties to avoid a war of rates. Its practical operation was to give all cotton from the Chattahoochee valley to the Georgia railroads, and it is exceedingly doubtful whether the steamships of the petitioner had anything to do with fixing the terms of the pooling contract of July 16, 1886, between the three railroads above mentioned. The conclusions of the master seem, from the evidence, to be irresistible, and he recommends that the prayer of the petitioner be denied.

The exceptions filed to this report are as follows:

*First.* That the master erred in not finding that there was a valid contract between the petitioner and H. R. Duval, receiver, established, under which the petitioner was entitled to its share of the pool moneys received by the said H. R. Duval, receiver, as alleged in the petition and as therein prayed for.

*Second.* The master erred in finding that the pooling contract finally entered into between the Georgia Central Railroad Company and the Savannah, Florida & Western Railroad Company, and the said H. R. Duval, receiver, was not substantially the same contract which was being negotiated between the said parties at the time the said receiver, through his traffic manager, F. B. Papy, assured the petitioner that it should have a share, to-wit, 60 per cent., of the pool moneys which were realized from the said pooling contract by the said H. R. Duval, receiver.

*Third.* The master erred in finding that when the said H. R. Duval, receiver, by his said traffic manager, F. B. Papy, assured the petitioner that it and the said receiver would realize jointly from the proposed pooling contract the sum of over $27,000, the said Papy referred to and was considering a different pooling contract than the one that was finally consummated as shown by the evidence.

*Fourth.* The master erred in finding that the petitioner is not entitled to any portion of the pool moneys for which it sued in the said petition, and in recommending that the said petition be dismissed.

*Fifth.* The master erred in divers other respects, both upon the law

and facts in the case, to be pointed out *ore tenus* at the hearing of these exceptions.

They do not comply with the rule in equity with reference to exceptions of this character. Exceptions to the master's report are regarded so far only as they are supported by the statement of the master, or by evidence to which the attention of the court is called by reference to the particular testimony. *Jaffrey* v. *Brown*, 29 Fed. Rep. 476, and cases there cited; *Taylor Manuf'g Co.* v. *Hatcher Manuf'g Co.*, 39 Fed. Rep. 440. The exceptions make no allusion to the evidence, whereas they should have set out that portion of the evidence upon which the exceptor relied. This, however, involves no testimony, and the only reference to it by the master, unsupported, was probably not deemed advisable by the solicitor for the petitioner. We are, as a consequence, limited in our consideration of the case exclusively to the master's report; and, since all the presumptions are in favor of the finding of the master, and since they appear to be satisfactory, and indeed conclusive, it is ordered and adjudged that the master's report recommending that the prayer of petitioner be denied shall stand confirmed, at the costs of petitioner, and that a decree be framed accordingly.